UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

JANICE BRADFORD,              )
                             )
        Plaintiff,            )
                             )        No. 1:11-cv-371
v.                           )
                             )        *Mattice / Lee*
COMMISSIONER OF SOCIAL SECURITY,   )
                             )
        Defendant.            )

## REPORT AND RECOMMENDATION

Plaintiff Janice Bradford brought this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her supplemental security income ("SSI") and disability insurance benefits ("DIB"). Plaintiff has moved for judgment on the pleadings and Defendant has moved for summary judgment [Docs. 16, 18]. Plaintiff alleges the Administrative Law Judge ("ALJ") failed to accept the opinions of her treating sources, improperly substituted his lay opinion for those of her health professionals, and further alleges new and material evidence warrants a remand of her claim. For the reasons stated below, I **RECOMMEND** that (1) Plaintiff's motion for judgment on the pleadings [Doc. 16] be **DENIED**; (2) the Commissioner's motion for summary judgment [Doc. 18] be **GRANTED**; and (3) the decision of the Commissioner be **AFFIRMED**.

## I.    ADMINISTRATIVE PROCEEDINGS

Plaintiff initially filed her applications for SSI and DIB on June 25, 2010, alleging disability as of January 1, 2010 (Transcript ("Tr.") 121-31). Plaintiff's claim was denied initially and upon reconsideration and she requested a hearing before the ALJ (Tr. 57-66, 70-75). The ALJ held a

hearing on June 9, 2011, during which Plaintiff was represented by an attorney (Tr. 27-56). The ALJ issued his decision on June 17, 2011 and determined Plaintiff was not disabled because there were jobs that existed in significant numbers in the economy that she could perform (Tr. 10-22). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final, appealable decision of the Commissioner (Tr. 2-7). Plaintiff filed the instant action on December 14, 2011 [Doc. 2].

## II.      FACTUAL BACKGROUND

### A.      Education and Background

Plaintiff had graduated high school and had attended special education classes (Tr. 145). She was 44 at the time of the hearing before the ALJ and the ALJ's decision (Tr. 36). Plaintiff testified that she could write but had problems reading some things (Tr. 36). Although Plaintiff alleged disability as of January 1, 2010, she stated she had last worked in August or September of 2010 (Tr. 36-37). Plaintiff did not have a consistent living situation and sometimes stayed with her son and other times stayed with a friend; she had a driver's license but was not allowed to drive (Tr. 37). Plaintiff testified her main problems were seizures and panic attacks, and she was taking Dilantin and Lamictal for the seizures and Klonopin for the panic attacks (Tr. 38-39). Plaintiff also stated she had problems with her right shoulder after a seizure that caused a separated shoulder (Tr. 39-40). When asked why she had wrist braces on, Plaintiff explained one wrist was injured in a car accident two years ago, testified further about her shoulder problems, and then stated she lost strength in her hands and pain radiated from one shoulder down to her hand and made it go numb (Tr. 40). Plaintiff stated that as a result of losing strength in her shoulder, she could not pick anything up (Tr. 41).

Plaintiff testified she had had two seizures in the last week, but sometimes had three or four

a week, and other times had a couple a day (Tr. 42). Every time Plaintiff was stressed, she would

have a seizure (Tr. 42). After Plaintiff had a seizure, she usually needed to sleep because she lost

all her energy (Tr. 42). Plaintiff could not really tell the difference between her seizures and panic

attacks but she believed they were seizures noting she had been having seizures since she was six

years old; she testified her panic attacks usually involved shaking and becoming unconscious (Tr.

43). Plaintiff could not see a neurologist because she had no income and could not afford it (Tr. 43).

B.      Vocational Expert Testimony

The ALJ summarized Plaintiff's condition as involving a panic disorder, borderline

intellectual functioning, and a substance induced mood disorder (Tr. 44). With this in mind, the ALJ

asked vocational expert Jane Colvin-Roberson (the "VE") to assume an individual with a panic

disorder and a mild to moderate depressive disorder and the physical limitations as outlined by Dr.

Cohn (i.e. no exposure to pollutants and hazards); he further stated the individual would have the

borderline intellectual capabilities outlined in Mr. Stair's assessment and the mental limitations

outlined by file reviewer Dr. Davis, and noted Dr. Geddam's diagnosis of substance abuse mood

disorder and benzodiazepine dependence (Tr. 45-48). The VE testified that an individual with these

limitations could not perform Plaintiff's past relevant work (Tr. 48-49). The ALJ further restricted

the hypothetical by asking the VE what reduction would be required given the individual's

limitations and the VE testified to a 60% reduction; the ALJ then removed heavy and medium work

from the equation and asked if jobs would remain (Tr. 51). The VE testified that such an individual

could perform work as a hand packer, with approximately 7,000 jobs in the state and 370,000

nationally; an inspector, with 3,100 jobs regionally and 125,000 nationally; or an assembler at the

light exertional level, with 1,600 jobs in the state and 40,000 nationally (Tr. 51-52). The VE

testified that an individual limited as Plaintiff described in her testimony would be unable to perform any jobs (Tr. 45-46).

Plaintiff's counsel asked the VE if the hypothetical individual could perform the same jobs specified if the individual's ability to maintain persistence and concentration for a full workday was moderately to markedly impaired (Tr. 53-54). The VE testified an individual with a marked limitation in this area could not perform those jobs, but an individual with a moderate limitation could (Tr. 54). Plaintiff's counsel clarified the question by stating the limitation would wax and wane between moderate to marked, and the VE testified that a variable level of concentration that would be marked unpredictably would preclude sustained work (Tr. 54-55).

### C.     Medical Records

Plaintiff reported to Parkridge Medical Center ("Parkridge") on June 14, 2007 for pain in her hand that she thought was caused by a recent seizure (Tr. 239-49). Plaintiff followed with nurse practitioner Judith Buhrman ("NP Buhrman" or "Ms. Buhrman") at North Shore Health Center ("NSHC") from 2007 through 2010. In July 2007, Plaintiff reported having eight seizures over two to three months and increased stress (Tr. 276). During an appointment in September 2007, Plaintiff reported she had seizures when she forgot to take her medication but they were controlled when she took medication and her stress level was low (Tr. 275). In June 2008, Plaintiff reported a recent visit to the Memorial Hospital ("Memorial") Emergency Room ("ER") and stated she was having multiple seizures (Tr. 274). At her appointment in September 2008, Plaintiff reported a recent seizure while sleeping; she also reported a recent seizure in February 2009 after forgetting to take her medication (Tr. 272-73).

Plaintiff was taken to Parkridge on January 8, 2009 after a seizure caused when she ran out

of her medication (Tr. 228-38). Plaintiff was taken to the ER again on April 4, 2009 after seizures when she had a shouting match with her boyfriend and missed doses of her medications (Tr. 216-27). Plaintiff reported having a long-standing history of seizure disorder and frequent seizures (Tr. 218). Plaintiff took her missed dose while in the ER and was released with instructions not to miss her doses (Tr. 219-23).

Plaintiff returned to NSHC on August 12, 2009 and reported a recent Memorial visit for seizures that occurred because she was non-compliant with her medication; she also reported a seizure the day before (Tr. 271). Plaintiff reported a seizure the day before her appointment on October 12, 2009 and stated she had had 14-15 seizures the week before (Tr. 270). During an appointment on May 17, 2010, Plaintiff stated she had multiple seizures where she couldn't remember her name, and had tripped and fallen down during a seizure on May 14, causing pain on her right side (Tr. 269). Plaintiff was referred for an MRI of her brain and an electroencephalogram ("EEG") (Tr. 269).

Plaintiff presented to Memorial on May 19, 2010 after a seizure and reported she had fallen a few days ago and was having chest pain; she reported that her seizure activity was worse with yelling and shouting (Tr. 262-66). A scan of Plaintiff's chest was normal with no active pulmonary pathology (Tr. 260). During her appointment at NSHC on May 26, 2010, it was noted Plaintiff had a recent flurry of pseudo-seizures (Tr. 268). On June 11, 2010, Plaintiff presented to Memorial for the MRI of her brain, which revealed no acute infarction, subtle cerebritis, mass or hydrocephalus (Tr. 250-52). Plaintiff also had an EEG which was abnormal due to frequent epileptiform activity; it was potentially epileptogenic but no seizures were recorded (Tr. 253-54).

At Plaintiff's June 29, 2010 appointment at NSHC, it was noted she was shaking, stuttering

and upset in the waiting room but calmed down once she was in an examination room (Tr. 267). Plaintiff was taken to Parkridge on July 18, 2010 after having seizure-like symptoms because she was shaking from a panic attack (Tr. 286-301, 309-20). Plaintiff was diagnosed with panic disorder without agoraphobia and epilepsy, unspecified (Tr. 310). Plaintiff was taken to Parkridge again on August 6, 2010 for a panic attack after her son was arrested (Tr. 302-08). Plaintiff continued to follow with NP Buhrman at NSHC and reported having a seizure at work a few weeks before her September 1, 2010 appointment; she also reported her recent ER visit and having panic attacks and increased stress at work (Tr. 385).

Plaintiff submitted to a psychological evaluation with Arthur Stair, M.A., LPE, on September 16, 2010 (Tr. 321-26). Plaintiff reported being in special education classes in school and stated she had seizures when she got upset (Tr. 321). Plaintiff felt overwhelmed and experienced panic symptoms when she was in bothersome situations; she would feel like she could not breathe and her heart would beat rapidly (Tr. 321). Plaintiff reported financial and situational problems and previous suicidal thoughts (Tr. 321). Mr. Stair noted Plaintiff's learning difficulties appeared to be moderate to severe in all subjects and suspected Plaintiff had graduated with a special education diploma (Tr. 322). Mr. Stair observed that Plaintiff's thinking pattern was organized, but concrete and simplistic, and that she could maintain a logical and coherent train of thought (Tr. 322). He opined Plaintiff's cognitive abilities were within the upper end of the borderline intellectual functioning range (Tr. 322). Mr. Stair further observed Plaintiff's affect was somewhat dysphoric (Tr. 322). Plaintiff reported symptoms of moderate anxiety, mild agoraphobia, mild to moderate panic disorder symptoms, mild depression, and one past suicide gesture (Tr. 323). Mr. Stair opined seizures should be ruled out medically because Plaintiff reported seizure-like episodes, but the symptoms involved

sounded like panic attacks (Tr. 323).

Mr. Stair administered the WAIS-IV test and confirmed Plaintiff was in the borderline range of intellectual functioning with a full scale IQ of 77 (Tr. 324). The WRAT4 text was also administered, which revealed Plaintiff was reading words at the 4.2 grade level, was understanding written sentences at the 6.0 grade level, could spell at the 3.9 grade level, and could solve arithmetic equations at the 3.7 grade level (Tr. 324-25). Mr. Stair diagnosed Plaintiff with panic disorder with agoraphobia, mild to moderate; major depressive order, mild; and borderline intellectual functioning; Plaintiff's Global Assessment of Functioning ("GAF") score was 52[1] (Tr. 325). Mr. Stair opined Plaintiff could understand simple information or directions and put it to use in a vocational setting, but her ability to understand and implement multistep complex instructions was mildly to moderately impaired given her borderline intellectual functioning and low test scores (Tr. 325). He further opined her ability to adapt to changes in the work place was moderately impaired and her ability to maintain concentration and persistence for a full workday and workweek was moderately to markedly impaired due to panic disorder with agoraphobia, depression, and borderline intellectual functioning (Tr. 325). Plaintiff's social relationships were moderately impaired because of her withdrawal from others due to depression and panic disorder with agoraphobia (Tr. 325). Mr. Stair's report was countersigned by Dr. Charlton Stanley, supervising psychologist (Tr. 326).

Plaintiff began following with Fortwood Center ("Fortwood") for her mental health symptoms on September 20, 2010 (Tr. 370-71). At her intake session, Plaintiff reported constant

---

[1] A GAF score between 41 and 50 corresponds to a "serious" psychological impairment; a score between 51 and 60 corresponds to a "moderate" impairment; and a score between 61 and 70 corresponds to a "mild" impairment. *Nowlen v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 718, 726 (E.D. Mich. 2003).

stress and panic attacks four times a week where she could not breathe, felt dizzy, shook, and had chest pains and numbness; Plaintiff reported having a seizure with every panic attack (Tr. 370). Plaintiff also reported feeling anxious and depressed all the time and had experienced these problems for years (Tr. 370). Plaintiff reported losing her job at Hardee's because of her seizures (Tr. 370). Plaintiff was diagnosed with panic disorder without agoraphobia, depressive disorder, not otherwise specified, benzodiazepine dependency, and her assigned GAF score was 50 (Tr. 371).

On September 26, 2010, Dr. Marvin H. Cohn reviewed Plaintiff's file and filled out a Physical Residual Functional Capacity Assessment form (Tr. 329-37). Dr. Cohn opined Plaintiff had no exertional, postural, manipulative, visual or communicative limitations but she should avoid all exposure to hazards and avoid concentrated exposure to fumes, odors, gases, and poor ventilation due to her reported, but unconfirmed, asthma (Tr. 330-33). Dr. Cohn noted Plaintiff's complaints of frequent seizures but opined her allegations were partially credible because her seizures were controlled when her medications were taken consistently as directed and the seizures often involved shaking which was likely related to a panic disorder (Tr. 336). Dr. Cohn opined Plaintiff could completely control her seizures with strict adherence to treatment and resolution of her mental symptoms (Tr. 336). Dr. Reeta Misra reviewed Plaintiff's file and affirmed this assessment on November 16, 2010 (Tr. 362).

Dr. George Davis filled out Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity Assessment ("MRFC") forms on September 28, 2010 (Tr. 338-55). In the PRT, Dr. Davis opined Plaintiff would have moderate limitations in maintaining social functioning and maintaining concentration, persistence and pace; she had mild limitations in activities of daily living (Tr. 348). Dr. Davis noted he was giving the psychological examination great weight, as the

opinions therein were not inconsistent with any other evidence in the record (Tr. 350). Dr. Davis opined Plaintiff's symptoms would not prevent her from performing work but would cause moderate limitations such that she could do simple and 1-3 step detailed tasks (Tr. 350). In his MRFC, Dr. Davis opined Plaintiff was moderately limited in her abilities to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychological symptoms, interact appropriately with the general public, accept instruction and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them, respond appropriately to changes in the work setting, and set realistic goals or make independent plans (Tr. 352-53). Dr. Davis further opined Plaintiff could concentrate and persist for two hours at a time in an eight hour day, could interact appropriately with the public, coworkers and supervisors subject to the restrictions noted, but would be better at working with things, and could adapt to infrequent change and set limited goals (Tr. 354). Dr. Brad Williams affirmed this assessment on November 11, 2010 (Tr. 361).

Dr. Padmavathi Geddam with Fortwood completed Plaintiff's psychiatry assessment on October 4, 2010 and noted she appeared to be intoxicated on benzodiazepines, as her speech was slurred, concentration was poor, and she focused on panic attacks and her need for Klonopin (Tr. 365-67). Plaintiff was strongly encouraged to consider detoxification but was not interested and was angry and hostile towards Dr. Geddam (Tr. 365-67). Dr. Geddam diagnosed Plaintiff with a substance induced mood disorder and benzodiazepine dependence and her assigned GAF score was 55 (Tr. 367). At Plaintiff's October 19, 2010 appointment at NSHC, Plaintiff stated she had lost everything and was very stressed (Tr. 384). During an appointment with a therapist at Fortwood on October 28, 2010, Plaintiff reported that benzodiazepines would be most beneficial to her but that

Dr. Geddem did not want her to be on benzodiazepines; on December 16, 2010, Dr. Geddem confronted her with this "inaccurate and misrepresentation of the information" given to the therapist and noted this was an indication of Plaintiff's borderline behavior (Tr. 364). Plaintiff was to be transferred to Ms. Moore (Tr. 364).

On October 25, 2010, NP Buhrman filled out a form stating that Plaintiff could not work a regular work schedule without missing more than two days per month (Tr. 202-05). Ms. Buhrman stated Plaintiff experienced seizures since childhood, uncontrolled panic attacks, pseudo-seizures, non-compliance secondary to stress, and financial limitations (Tr. 202). The majority of the form has slashes drawn through each box pertaining to physical limitations, but Ms. Buhrman indicated that Plaintiff had potential problems with alertness, concentration and stamina due to her seizure medication and that she experienced frequent attacks of balance disturbance due to seizures (Tr. 203-04). Ms. Buhrman noted Plaintiff experienced depression, irritability, and fatigue and noted that objective evidence supported her opinions (Tr. 205). Ms. Buhrman filled out a mental medical source statement on October 25, 2010 as well and indicated Plaintiff could not work a regular workweek (Tr. 206-08). Ms. Buhrman opined Plaintiff had poor abilities in adapting to stressful circumstances at work, behaving in an emotionally stable manner, relating predictably in social situations, and dealing with the stress of ordinary work (Tr. 207-08). Plaintiff had fair abilities in concentration, persistence and pace, understanding, remembering and carrying out detailed or complex instructions, and dealing with the public (Tr. 207-08). Plaintiff's abilities were good in understanding, remembering and carrying out simple instructions, following work rules, maintaining personal appearance, demonstrating reliability, and relating to supervisors and co-workers (Tr. 207-08). Ms. Buhrman opined Plaintiff was unlimited in her activities of daily living and social

functioning (Tr. 207).

Scans of Plaintiff's chest and left forearm on November 23, 2010 were normal (Tr. 378). Plaintiff returned to NSHC on November 30, 2010, reporting a seizure three days prior (Tr. 382). She also reported a recent ER visit for chest pain (Tr. 382). At her January 20, 2011 appointment, Plaintiff reported the homeless center/Fortwood said they could not help her, and she was still having seizures or pseudo-seizures (Tr. 380). Plaintiff saw nurse practitioner Amity Moore at Fortwood on February 10, 2011 and was anxious, irritable and angry; she stated she had been told the Center could help her get her "nerve pills" (Tr. 363). Ms. Moore observed Plaintiff was experiencing depression and noted Plaintiff requested benzodiazepines for her seizures, but informed her they did not treat seizures and she should consult with her primary care physician (Tr. 363). During a February 17, 2011 appointment at NSHC, Plaintiff said she thought she had had two seizures in 10 days (Tr. 379). Plaintiff began seeing a physician's assistant at NSHC at her March 22, 2011 appointment and reported her last seizure was two or three days ago and she was also having migraines every two or three days (Tr. 402). PA McDowell noted Plaintiff had an episode while she was in the room that involved jerking and shaking (Tr. 402). On April 25, 2011, Plaintiff brought in a log of her seizures, which noted one every day the week before (Tr. 400).

## III. ALJ'S FINDINGS

### A. Eligibility for Disability Benefits

The Social Security Administration determines eligibility for disability benefits by following a five-step process. 20 C.F.R. § 404.1520(a)(4)(i-v). The process provides:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable

physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009). The claimant bears the burden to show the extent of his impairments, but at step five, the Commissioner bears the burden to show that, notwithstanding those impairments, there are jobs the claimant is capable of performing. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

### B.     ALJ's Application of the Sequential Evaluation Process

At step one of the sequential evaluation process, the ALJ found Plaintiff had not engaged in any substantial gainful activity since January 1, 2010, the alleged onset date (Tr. 15). At step two, the ALJ found Plaintiff had severe impairments of seizure disorder, right shoulder pain, bilateral carpal tunnel syndrome, a medication induced mood disorder, and a panic disorder (Tr. 15). At step three, the ALJ found Plaintiff did not have any impairment or combination of impairments to meet or medically equal any of the presumptively disabling impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 (Tr. 15). The ALJ noted that he specifically considered Listing 12.06 (Tr. 15-16). The ALJ determined Plaintiff had the residual functional capacity ("RFC") to perform light work without exposure to hazards and without concentrated exposure to pulmonary irritants (Tr. 16). The RFC was further limited in that the work would involve simple and one to three step detailed tasks

12

and Plaintiff could concentrate and persist for two hours at a time in an eight hour workday, could interact appropriately with the public, coworkers and supervisors but would work better with things rather than people, and could adapt to infrequent change and set limited goals within these restrictions (Tr. 16). At step four, the ALJ found Plaintiff was unable to perform her past relevant work (Tr. 20). At step five, the ALJ found that Plaintiff was 43, a younger individual, on the alleged onset date and, after considering Plaintiff's age, education, work experience, and RFC, the ALJ found there were jobs that existed in significant numbers in the national economy which Plaintiff could perform (Tr. 21). This finding led to the ALJ's determination that Plaintiff was not under a disability as of January 1, 2010 (Tr. 21).

## IV.    ANALYSIS

Plaintiff first argues her case should be remanded because the full opinion of NP Buhrman was not in the record before the ALJ. Plaintiff further challenges the ALJ's rejection of Ms. Buhrman's opinion and Mr. Stair's psychological evaluation and finally argues the ALJ improperly substituted his own judgment and opinion instead of deferring to the diagnoses given Plaintiff by her treating and consultative sources.

### A.    Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence. 42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters*, 127 F.3d at 528). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the evidence must be "substantial" in light of the record as a whole,

"tak[ing] into account whatever in the record fairly detracts from its weight." *Id.* (internal quotes omitted). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387. The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may not, however, consider any evidence which was not before the ALJ for purposes of substantial evidence review. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Furthermore, the court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, No. 2:08-CV-189, 2009 WL 2579620, at *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, No. 1:08-CV-651, 2009 WL 3153153, at *7 (W.D. Mich. Sep. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claim of error without further argument or authority may be considered waived).

### B. Sentence Six Remand and Ms. Buhrman's Opinion

Plaintiff first argues the ALJ did not have the full eight-page opinion completed by NP

14

Buhrman and the ALJ was disinterested in reviewing the entire opinion during the hearing [Doc. 17 at PageID# 60-61]. Plaintiff contends it appears that the ALJ never read the full opinion and, as such, her claim should be remanded due to the ignored, material evidence [*id.* at PageID# 61]. Plaintiff argues this evidence warrants remand because, although it is not technically "new," it would support a different outcome [*id.* at PageID# 62]. Plaintiff further argues the ALJ erred in rejecting the incomplete opinion of NP Buhrman before him because even the small part of the opinion he referenced—NP Buhrman's indication that Plaintiff's ability to handle work-related stress was poor—would preclude work environments and belies the ALJ's characterization of Plaintiff's impairments as no more than moderate [*id.*]. Instead, Plaintiff notes that NP Buhrman's opinion stated she had poor functioning in a number of other areas and, even though Ms. Buhrman is an "other source," it was appropriate for the ALJ to consider her opinion because of her treating relationship with Plaintiff [*id.* at PageID# 63-67]. Finally, Plaintiff argues the ALJ misinterpreted both NP Buhrman's opinion and a form filled out by Fortwood in concluding Plaintiff had only moderate limitations [*id.*]

The Commissioner argues the complete copy of NP Buhrman's opinion does not warrant remand because the evidence is not material [Doc. 19 at PageID# 91-92]. The Commissioner asserts that NP Buhrman's opinion is inconsistent with the medical record and any missing pages do not contain any additional objective evidence or an opinion from an acceptable medical source, such that consideration of the other pages would not change the outcome of Plaintiff's claim [*id.* at PageID# 92]. The Commissioner further contends that NP Buhrman could not issue a medical opinion entitled to any specific weight because she is not an acceptable medical source and, for that reason, the ALJ was not required to give good reasons for discounting her opinion [*id.* at PageID# 88-89].

15

As a preliminary matter, Ms. Buhrman is not an acceptable medical source, she is instead an "other source," and the ALJ was not required to accept her opinion or assign it any controlling weight as the regulation states the ALJ "*may* also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work." *See* 20 C.F.R. § 404.1513(d) (emphasis added). It appears that only part of NP Buhrman's opinion, in the form of a disordered assortment of four pages, was before the ALJ (Tr. 356-60). The full seven-page opinion, which includes two completed forms titled "Treating Relationship Inquiry" and "Medical Source Statement (Mental)," appears in the administrative record and apparently was presented to the Appeals Council (Tr. 202-08; *see also* Doc. 17-1). It should also be noted that the hearing transcript indicates a complete paper copy of the opinion may have been provided directly to the ALJ by Plaintiff's counsel during the hearing (Tr. 30). However, given that it is unclear whether the full opinion was considered the ALJ, NP Buhrman's full opinion will be considered here in light of sentence six of 42 U.S.C. § 405(g).

Evidence submitted to the Court after the close of administrative proceedings cannot be considered for purposes of substantial evidence review. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Similarly, where the claimant presents new evidence to the Appeals Council, but the Appeals Council declines to review the ALJ's decision, as here, that new evidence may not be considered during review on the merits. *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993). Instead, the new evidence can be considered only for purposes of remand pursuant to sentence six of 42 U.S.C. § 405(g), which authorizes the court to remand a case for further administrative proceedings "if the claimant shows that the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding." *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148

(6th Cir. 1996). The evidence is material "only if there is a 'reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010) (quoting *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001)); *see also Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007) ("Material evidence is evidence that would likely change the Commissioner's decision"). Plaintiff bears the burden of showing that remand is appropriate under 42 U.S.C. § 405(g). *See Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 653 (6th Cir. 2009).

The ALJ stated as follows with respect to the evidence from NP Buhrman:

> On October 25, 2010, Judith Buhrman, FNP completed a Treating Relationship Inquiry in which she reported treating the claimant for an uncontrolled seizure disorder, panic attacks, and pseudoseizures. She opined that the claimant would be chronically absent from a full time work schedule. The claimant's impairments resulted in fatigue, irritability, and depression. Mrs. Buhrman opined that the claimant's ability to deal with stress was poor and her ability to deal with the public was only fair. Her judgment was good to fair. The claimant's mental functioning in all other areas was good. Mrs. Buhrman did not assess any physical limitations related to the claimant's impairments. [Citing to Exhibit 10F, the four pages of NP Buhrman's opinion reference above.]
> . . .
> Regarding her alleges [sic] physical limitations, there is little evidence to support her allegations of bilateral hand weakness and right shoulder pain. There are no nerve conduction studies of her upper extremities to officially diagnose her symptoms. Furthermore, Mrs. Bhurman [sic], her nurse practitioner did not opine that the claimant had any physical restrictions relating to these allegations.
>
> I have assigned little weight to Mr. Stair's opinion indicating that the claimant's ability to maintain persistence and concentration on tasks for a full workday was moderately to markedly limited. This opinion is not supported by the evidence of record, including notes from Fortwood Center and Mrs. Buhrman's Treating Relationship Inquiry, which show that the claimant is not more than moderately limited in all areas of mental functioning.

17

(Tr. 19-20).

The parts of NP Buhrman's opinion not cited by the ALJ consist of more areas of physical limitations NP Buhrman marked lines through, her notation that Plaintiff could potentially experience problems with alertness, concentration and stamina and could experience attacks of balance disturbance due to seizures and seizure medicine, and an additional sheet of checkmarks concerning Plaintiff's mental limitations which indicated she had "poor" abilities in three more areas and "fair" abilities in an additional three areas (Tr. 203-04, 207). None of the pages of NP Buhrman's opinion contained any detailed explanation for her opinion that Plaintiff would be unable to work or pointed to specific evidence supporting the opinion.

Moreover, although the ALJ could have accepted the part of NP Buhrman's opinion he reviewed, he was not required to do so nor was he bound to give adequate reasons for rejecting the opinion. As an "other source," it was within the ALJ's discretion to review NP Buhrman's opinion and decide what weight it deserved, if any. The ALJ's decision makes clear that NP Buhrman's opinion was not assigned any particular weight and the ALJ did not consider her opinion of Plaintiff's disability worthy of weight. It is unlikely the additional four pages not reviewed by the ALJ would have provided any other information which would have persuaded the ALJ to give NP Buhrman's opinion any additional weight, thus, it is unlikely the outcome would have changed upon review of the full opinion. Accordingly, I **FIND** the evidence is not material, as it would not change the outcome on Plaintiff's claim. As such, I **CONCLUDE** remand pursuant to sentence six of 42 U.S.C. § 405(g) is not warranted.

I further **CONCLUDE** the ALJ did not err in his treatment of NP Buhrman's opinion. As stated above, it was within the ALJ's purview to consider her opinion in determining Plaintiff's

18

work capabilities and limitations, and the ALJ was not required to accept NP Buhrman's statement that Plaintiff could not work or her notations that Plaintiff had "poor" abilities in any mental functioning areas.  It is clear from the decision that the ALJ chose not to credit the opinion, and there is no error in this decision regardless of NP Buhrman's lengthy treating relationship with Plaintiff.  It bears noting that Plaintiff saw NP Buhrman for a variety of complaints over the years and often to refill her medications, but NP Buhrman is not a mental health professional, and Plaintiff did not consistently complain to NP Buhrman of mental health problems.  It also bears noting that Plaintiff frequently reported past seizures, past panic attacks, and past hospital visits to NP Buhrman, but NP Buhrman had little means of verifying these occurrences with objective evidence beyond Plaintiff's reports and her referral for an MRI and EEG, which were somewhat inconclusive.  As such, I **CONCLUDE** the ALJ's treatment and apparent rejection of NP Buhrman's opinion, even if only part of the full opinion was before him, was supported by substantial evidence.

### C.      Mr. Stair's Evaluation

Plaintiff makes a somewhat general argument with respect to the ALJ's treatment of Mr. Stair's psychological evaluation report, stating the ALJ's rejection of the opinion was not supported by substantial evidence [Doc. 17 at PageID# 62].  Plaintiff's argument is based, however, on the fact that the ALJ apparently relied upon NP Buhrman's notes in her Treating Relationship Inquiry and the notes from Fortwood to support his statement that Mr. Stair's evaluation was inconsistent with the evidence in the record, which showed Plaintiff had moderate limitations [*id.*].  Plaintiff further argues the ALJ improperly relied upon a form filled out by Fortwood, which indicated Plaintiff had moderate limitations, when the form's definitions of the categories of limitations were actually more severe than the definitions for equivalent terms used by the Social Security Administration [*id.* at

Case 1:11-cv-00371-HSM-SKL   Document 20   Filed 11/09/12   Page 19 of 25   PageID #: 113

PageID# 63-64]. The Commissioner argues the ALJ's decision to give Mr. Stair's evaluation less weight was supported by substantial evidence because Mr. Stair's opinion was inconsistent with Plaintiff's records from Parkridge, Memorial, and Fortwood, including notations that Plaintiff's GAF was in the moderate range [Doc. 19 at PageID# 89-90]. The Commissioner further asserts the ALJ acted properly in giving more weight to the opinion of the state agency consultant who reviewed Plaintiff's records and opined as to her mental limitations, as this opinion was more consistent with the medical evidence in Plaintiff's record [*id.* at PageID# 90-91].

The ALJ stated he assigned little weight to Mr. Stair's opinion that Plaintiff's ability to maintain persistence and concentration for a full workday and workweek was moderately to markedly limited because it was not supported by the evidence in the record that indicated Plaintiff had only moderate impairments (Tr. 20). I **FIND** no error in the ALJ's conclusion that Mr. Stair's assessment was entitled to little weight. Plaintiff did not obtain mental health treatment from any mental health provider until she began following at Fortwood, where her treatment notes evince little else besides a focus on obtaining benzodiazepines. And, as noted above, before seeking treatment from Fortwood, Plaintiff did not consistently complain to NP Buhrman about any mental health issues, although she did often report high stress in her life and some panic attacks.

As such, there are no specific diagnoses of Plaintiff's mental conditions prior to Mr. Stair's evaluation and Plaintiff's assessment at Fortwood, and Mr. Stair did not explain why Plaintiff would have more severe impairments in maintaining persistence and concentration for a full workday. Indeed, it appears that his evaluation does not speak to any severe limitations, as Plaintiff reported to Mr. Stair that she had worked in fast food for 18 years and he observed she maintained a logical and coherent train of thought and was responsive to questioning without any bizarre or unusual

20

behaviors (Tr. 322). Plaintiff reported mild depression with concentration difficulties and Mr. Stair noted Plaintiff's affect was somewhat dysphoric (Tr. 323). Although Mr. Stair assessed Plaintiff with borderline intellectual functioning, there is no indication from his other observations that Plaintiff would have more severe deficiencies in concentrating and persisting for a workday and workweek, especially given her long work history.

Moreover, Mr. Stair assigned Plaintiff a GAF of 52, which indicates moderate limitations, and Plaintiff's initial GAF from Fortwood was 50 and then 55 as assessed by Dr. Geddam. It is unclear what notes from Fortwood the ALJ was referencing as part of his decision to give Mr. Stair's evaluation little weight, but the form Plaintiff challenges was filled out by a social worker at Plaintiff's initial intake. Review of treatment notes from Fortwood as a whole indicate Plaintiff was not severely impaired in her functional or mental abilities, and file reviewer Dr. Davis, whose evaluation was given great weight, opined Plaintiff could concentrate and persist for two hour time periods in an eight hour day (Tr. 354). This opinion was more in line with the evidence in the record, taken as a whole, than Mr. Stair's assessment of a more severe impairment in this area. Thus, I **CONCLUDE** the ALJ's decision to afford Mr. Stair's opinion little weight was supported by substantial evidence.

### D. ALJ's Opinion

In Plaintiff's final argument, she asserts the ALJ's decision is flawed because the ALJ improperly substituted his own judgment for that of Plaintiff's doctors to reach the medical opinion that Plaintiff did not suffer from a seizure disorder and, if she did, he improperly discredited the nature and frequency of her seizures and panic attacks and the functional limitations stemming therefrom [Doc. 17 at PageID # 67-68]. Plaintiff argues evidence in the record establishes she suffers

from a seizure disorder and a panic disorder, that she is truly having seizures (and not panic attacks), and that she has seizures even when she has been compliant with medication by taking Dilantin [*id.* at PageID# 68]. Plaintiff contends the ALJ was substituting his own opinion for that of the medical doctors and improperly relied upon the notations of an EMS medic to conclude Plaintiff did not have a seizure disorder [*id.* at PageID# 68-70]. Moreover, Plaintiff argues the ALJ improperly relied on some notations about Plaintiff's non-compliance with her medications to reach the conclusion that Plaintiff would not have seizures if she took her medication regularly, when it is clear from the record that Plaintiff had seizures while taking Dilantin as prescribed and had to have another medication added after a flurry of seizures [*id.* at PageID# 68]. The Commissioner does not specifically respond to this argument and argues more generally that the ALJ properly considered the notes and opinions in the record and his decision was supported by substantial evidence [Doc. 19 at PageID# 85-86].

Plaintiff's argument appears to be focused on the following passage from the ALJ's decision:

> An MRI of the claimant's brain, dated June 11, 2010 was negative. There was no acute infarct, no evidence of any subtle cerebritis, and no evidence of a mass or hydrocephalus. An electroencephalogram was abnormal. It showed frequent epileptiform activity in the left mid temporal head region. This activity was potentially epileptogenic. There were no seizures recorded.
>
> On July 18, 2010, emergency medical services were dispatched to the claimant's location for reported seizure activity. Notes indicate the claimant was shaking all over. An unnamed physician noted that the claimant did not appear to have a seizure. She was fully aware of her surroundings and was willing to perform all tasks when asked to do so. She was diagnosed with a panic disorder without agoraphobia, and epilepsy.
> . . .
>
> The medical evidence shows that the claimant's seizure activity generally increases when she is off her medications. If she remained

> compliant with her medications, her seizure activity would probably be less frequent. Furthermore, the evidence from the unnamed emergency services physician indicates that the claimant may be suffering from a panic disorder, rather than a seizure disorder. He noted that she did not appear to be having a seizure and that her behavior after her episode was not typical post-seizure behavior.

(Tr. 17, 19).

The ALJ's statements about this particular piece of evidence do seem to be based on the emergency services medic's form; however, I **FIND** these statements cannot be interpreted to mean what Plaintiff claims—that the ALJ was definitively deciding Plaintiff did not have a seizure disorder and instead only suffered from panic attacks. During this particular visit to the ER referenced in the decision, it was determined that Plaintiff seemed to be having a panic attack rather than a seizure (Tr. 287). In addition, both Mr. Stair and Dr. Cohn noted that Plaintiff's symptoms of shaking did not seem to be in line with a seizure disorder and instead more closely resembled panic attacks, and NP Buhrman made a notation about whether Plaintiff was having panic attacks vs. pseudoseizures (Tr. 323, 336, 384). Nonetheless, the ALJ found Plaintiff had a severe impairment of a seizure disorder and, in the context of that finding, this portion of the decision challenged by Plaintiff appears to be commentary that Plaintiff's primary problem might instead be her panic disorder and other mental disorders instead of a disabling physical problem caused by seizures (Tr. 15). I **CONCLUDE** that such comments, which state only a possible conclusion, do not warrant remand.

As for Plaintiff's claim that the ALJ unreasonably reached his own conclusion that Plaintiff would not have seizures if she took her medication regularly, I also **CONCLUDE** there is no error in the ALJ's statement that Plaintiff *might* see a decrease in her seizures if she remained compliant with medication. Plaintiff herself reported seizure activity after missing doses of her medication

23

multiple times, stated seizures were controlled when she took her medications and her stress levels were low, and had non-therapeutic levels of her seizure medications at the ER visit referenced above (Tr. 218, 230, 271, 272, 275, 276, 280, 288, 295, 313, 320); NP Buhrman noted Plaintiff's seizures were uncontrolled but Plaintiff was non-compliant with her medication secondary to stress and financial limitations (Tr. 202); and Dr. Cohn opined that Plaintiff's seizures were controlled when medication was taken as directed (Tr. 336). Moreover, even if there was no evidence in the record to support the ALJ's statement to that effect, there is no treating physician opinion in the record stating that Plaintiff is physically disabled due to her seizures and the seizures could not be controlled even if she was 100% compliant with medication. In the absence of any such definitive statement, and given the evidence in the record that supports the ALJ's statement, I **FIND** the ALJ did not improperly substitute his opinion for that of Plaintiff's doctors when he stated Plaintiff might see a decrease in seizures if she took her medication regularly.

Accordingly, and after reviewing all Plaintiff's arguments, I **CONCLUDE** the decision of the ALJ was supported by substantial evidence.

## V.     CONCLUSION

Having carefully reviewed the administrative record and the parties' arguments, I

**RECOMMEND** that:[2]

    (1)     Plaintiff's motion for judgment on the pleadings [Doc. 16] be **DENIED**.

    (2)     The Commissioner's motion for summary judgment [Doc. 18] be **GRANTED**.

    (3)     The Commissioner's decision denying benefits be **AFFIRMED**.

                                   *s/ Susan K. Lee*
                                     SUSAN K. LEE
                                     UNITED STATES MAGISTRATE JUDGE

---

[2] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).